IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
CIVIL ACTION NO: 3:04CV001

| CORETTA R. CALDWELL, | ) | |
|---|---|---|
| Plaintiff | ) | |
| | ) | |
| vs. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| JO ANNE B. BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |
| | ) | |

**THIS MATTER IS BEFORE THE COURT** on Coretta R. Caldwell's "Motion for Summary Judgment" (Document No. 7), filed May 28, 2004, and the Commissioner's "Motion for Summary Judgment" (Document No. 9) and "Memorandum in Support of the Commissioner's Decision" (Document No. 8), filed July 19, 2004. This case has been referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B), and these motions are now ripe for disposition.

While this is a close case, having considered the written arguments, administrative record, and applicable authority, the undersigned will respectfully recommend that Ms. Caldwell's Motion for Summary Judgment be <u>denied</u>, that the Commissioner's Motion for Summary Judgment be <u>granted</u>, and that the Commissioner's decision be <u>affirmed</u>.

## I. PROCEDURAL HISTORY

On July 13, 2000, Ms. Caldwell applied for Supplemental Security Income, alleging that she became disabled on January 1, 1983 due to a malformed brain stem. (R. 78.) Ms. Caldwell's claim was denied initially and again on reconsideration.

Ms. Caldwell requested a hearing, which was held on November 6, 2002. On December 30,

1

2002, the Administrative Law Judge ("ALJ") issued an unfavorable decision denying Ms. Caldwell's claim. (R. 11, 23.) The Appeals Council denied Ms. Caldwell's Request for Review, making the hearing decision the final decision of the Commissioner. (R. 5-8.)

Ms. Caldwell filed this action on January 5, 2004, and the parties' cross-motions for summary judgment are now ripe for this Court's consideration.

## II. FACTUAL BACKGROUND

Ms. Caldwell testified that she was born November 15, 1981; that she lives at home with her mother and brother; that she graduated from high school; that she took some classes in college but was not in school at the time of the hearing; and that she does not receive Medicaid health insurance. (R. 33-36.)

Regarding employment, Ms Caldwell testified that she has never held a job but instead relies on her mother for shelter and food. (R. 36.)

Regarding her medical and emotional condition, Ms. Caldwell testified that her major medical problem is epilepsy and seizures; that, when she has seizures, she becomes "real weak," her "left side starts shaking," and then she falls down; that she goes completely unconscious for as long as five minutes when she has a seizure and at times has lost control of her bladder; that, when she regains consciousness, she has migraine headaches, sees "double," is unable to walk unassisted, is "real weak," does not know where she is, cannot carry on a conversation, and does not regain normal capacity for up to two hours. (R. 37, 42-44.)

Ms. Caldwell testified further that she occasionally has headaches not associated with her seizures that feel like she has been "hit in the head with a book"; that, when she has the headaches, she is unable to read; that she takes medication for the headaches; that the medication she takes for

2

seizures makes her "confused, tired, and weak" and sometimes causes her to see double; that she has nausea and dizziness not associated with her seizures that requires her to lie down for two to three hours; that she lies down and sleeps every day due to lack of energy; and that she has a lot of fear about being around people who do not know her or her condition and would be uncomfortable going alone to the doctor or to a public place like the mall. (R. 44-48.)

With respect to her daily activities, Ms. Caldwell testified that she does not have a driver's license because of her seizures and epilepsy; that she sometimes goes with her mother to the grocery store; that she does not participate in outdoor recreational activities or gardening; that she cannot watch television for a long period of time because it affects her sight; that she reads and does crossword puzzles; that she goes out with friends only "once every weekend" or "once a month" because she is embarrassed when she has seizures around people she does not know; and that she goes to church on Wednesdays and Sundays. (R. 36-40.)

Ms. Caldwell testified further that she normally wakes up around seven o'clock when her mother begins getting ready for work; that she can fix herself a sandwich but does not cook on the stove; that she is responsible for keeping her own room clean, including sweeping, dusting, and making the bed; and that she does not take walks. (R. 40-42.)

Shirley McClean, Ms. Caldwell's mother, testified that Ms. Caldwell is sometimes confused and does not get facts straight; that Ms. Caldwell lives at home with both her mother and father, and her brother is away at college; that Ms. Caldwell took classes at Gaston College, but she did not complete any classes, dropping all but one and flunking the one she did not drop; that Ms. Caldwell continues to have seizures at an average rate of about one per month; that the longest Ms. Caldwell has gone without a seizure is eight months when she was in elementary or junior high school; that

the seizures began when Ms. Caldwell was fourteen months old; that doctors are exploring putting a vagal stimulator in Ms. Caldwell after attempting numerous regimens of medication; that Ms. Caldwell was referred to another doctor; that she places pills in a box for Ms. Caldwell in the morning and at night; that she has an answering machine at the house because Ms. Caldwell cannot be relied on to take messages; and that Ms. Caldwell once had a seizure on a church van. (R. 48-51, 55-56, 61.)

Ms. McClean described her daughter's medical condition, testifying that during a typical seizure Ms. Caldwell cries out "momma," begins shaking on her left side, and then begins "jerking" with her legs and full body; that Ms. Caldwell has an "aura" and can "kind of tell" when she is going to have a seizure and is usually able to make it to a chair or to lie down on the floor; that Ms. Caldwell's seizures typically last two to fifteen minutes; that, following the seizure, Ms. Caldwell "can hear you but she can't respond back," has a "nasty headache," has a problem with coordination, and experiences weakness, fatigue, and confusion; that it would take Ms. Caldwell up to two to two and a half days before she could return to her normal functioning ability; and that Ms. Caldwell complains of being dizzy "most of the time," reports feeling weak, and less often experiences nausea. (R. 51-55.)

Janette Clifford, a vocational expert, agreed that there are jobs available in the national economy for employees who, because of their medical condition, could only do "light jobs, simple one and two step job tasks, not around dangerous heights or unprotected machinery." Ms. Clifford testified that these jobs included marker two or laborer, linen grader, and micro film mounter. Ms. Clifford acknowledged that, unless an employer were "very sympathetic," it would be difficult to maintain long-term employment if the employee were not able to function at least once a month. (R.

4

59-60.)

The record also contains a number of representations made by Ms. Caldwell in her various applications and forms. On a Disability Report dated August 11, 2000, Ms Caldwell stated that she has "trouble understanding at times"; that her epilepsy would prevent her from standing for long periods and may cause her to "fall out" at work; that her illness causes her "a lot of fatigue" and "depression"; and that she can get "very disoriented" after seizures. (R. 99-108.)

On a Reconsideration Disability Report, dated August 9, 2001, Ms. Caldwell stated that she is able to "tend to [her] own personal needs"; that her physical limitations remain the same since she filed her claim; and that there were no changes in her daily activities. (R. 109-115.)

On July 30, 1999, Barbara Hodge, vocational expert, issued a Vocational Evaluation Report stating that Ms. Caldwell needed a job in a "safe working environment away from machinery and high places." Mrs. Hodge administered an intelligence test and recommended that Ms. Caldwell pursue a career in the clerical field. (R. 89-94.)

On July 2, 2001, Robert Johnson, Ph.D., an Agency medical consultant, performed a Mental Residual Functional Capacity Assessment. Dr. Johnson determined that Ms. Caldwell may be moderately limited in her ability to respond appropriately to changes in the work setting; that Ms. Caldwell may have trouble understanding and carrying out "complex, detailed instructions"; that he noted "no social deficits"; that Ms. Caldwell's "cognitive deficits do not preclude following one to two step instructions"; that, due to anxiety, Ms. Caldwell "would have difficulty responding to constant changes in a work environment"; that Ms. Caldwell has moderate difficulty maintaining "concentration, persistence, or pace"; and that overall Ms. Caldwell "has the ability to perform simple, routine, repetitive tasks in a non-production environment." Dr. Johnson concluded that Ms.

Caldwell had an anxiety disorder, a personality disorder, and borderline intellectual functioning. (R. 126-143.)

On August 8, 2001, Charles Burkhart, M.D., an Agency medical consultant, performed a Physical Residual Functional Capacity Assessment. Dr. Burkhart determined that Ms. Caldwell was capable of occasionally lifting up to fifty pounds and frequently capable of lifting twenty-five pounds; that Ms. Caldwell could sit, stand, or walk for a total of about six hours a day; that Ms. Caldwell's ability to push or pull was unlimited; and that Ms. Caldwell's seizure activity had decreased since August 2000 when her medication was increased. (R. 144-151.)

On November 11, 2001, Jack Drummond, M.D., an Agency medical consultant, performed a second Physical Residual Functional Capacity Assessment. In that second assessment, he concluded that Ms. Caldwell had no exertional limitations.

The parties have not assigned error to the ALJ's factual findings as to the medical records he considered in rendering his decision. After carefully reviewing the medical chart, the undersigned adopts the ALJ's findings of fact as to those records, as follows:

> The medical records show that the claimant has had epilepsy since she was fourteen months old secondary to a malformed brain stem. When she was examined in January 1998, the claimant's physician noted that her seizure activity had [sic] irregular, and she had been known to have no seizures for several months and two to three in a month. The claimant had been on a regimen of Tegetrol and Depakote, and she and her mother reported satisfaction with her level of seizure control. However, in June 1998 she was experiencing some break through seizures on Depakote. The increase in seizure activity lasted throughout January 1999, but she also began to experience weight loss with decreased appetite, palpitations, fatigue, but none of these symptoms were attributed to her medication or seizure disorder. An EKG was normal, and her spells continued to be very episodic with weakness and fatigue. A heart monitor showed no abnormality, but the claimant also developed tinea capitis (Ex. 2F). Laboratory findings were thought to be consistent with mild anemia and leukopenia (Ex. 3F, p. 3). An EEG in September 1999 was abnormal due to a left temporal area of focal neuronal dysfunction, but did not show subclinical seizures, according to her pediatric neurologist, Robert A. Nahouraii, M.D. Dr. Nahouraii attributed some of her

6

symptomatology to co-morbid depression in October 1999, especially in light of the passing of her grandfather, and increased her dosage of Lamictal to 225 mg in the morning and 250 mg at night. However, within a year he had also diagnosed her with neuronal migration disorder due to fatigue and sleepiness (Ex. 4F). In November 2000, the claimant's mother reported that the claimant was having at least one seizure a month beginning in September 2000, but several in August 2000. The claimant's Lamictal was increased to 600 mg a day in August 2000 with a reduction in her seizure activity, but she complained of fatigue and weakness and occasional dizziness and nausea (Ex. 4F, p. 5).

The medical evidence also demonstrates an increase in the claimant's headache activity and dizziness in January 2001. She reported that her headaches were occurring at least two to three times a week even without any seizure activity, and although she was taking a lot of Ibuprofen, she still needed to lie down to relieve the pain. She did not report any focal neurological deficits. Her dizzy spells were also intermittent. However, her seizures had increased by January 2001, and her treating sources indicated that she had a brief seizure on examination on January 17, 2001 that lasted for about 10 seconds. She appeared almost dazed and did not seem to concentrate well, according to the treating notes. The claimant's treating neurologist, Dr. Nahourraii, indicated that her dizzy spells were equivalent to seizure activity (Ex. 11F, pgs. 2-3). The claimant began seeing another neurologist, Suzanne H. Nutt, M.D., in May 2001 (Ex. 7F). She was treated in the hospital emergency room on September 4, 2001 after having three seizures on the previous day. On examination she had slurred speech and weakness, but she was discharged home after increasing her dosage of Trilepetal to 750 mg at bedtime (Ex. 9F). She was also reportedly averaging about three seizures a month from November 2001 to December 2001, but her headaches were responsive to Excedrin, and her headaches were attributed to a side effect of Trilepetal although this side effect was thought to be temporary, according to the treating notes (Ex. 7F). The claimant had only one seizure from January 2002 to March 2002 after Topamax was added to her medication regimen (Ex. 11F, p. 17). A vagal nerve stimulator was also discussed with the claimant as a medical option if she continued to have break through seizure activity with her generalized tonoclonic seizures (Ex. 11F, p. 20).

The claimant's treating notes indicate that she also complained of double vision in her left eye in June 2002 and some diplopia after seizures. However, on examination, Dr. Nutt could not elicit any diplopia. Coordination was also intact finger to nose (Ex. 11F, p. 19). The claimant also underwent a state agency consultive [sic] vision examination with Norman M. Sawyer, M.D., on October 19, 2001 who noted that she had corrected vision of 20/25 bilaterally (ex. 10F).

The claimant underwent a consultative psychological evaluation on July 6, 2000 with Richard H. Willis, M.A., a licensed psychologist. Mr. Willis administered the Wechsler Adult Intelligence Scale-III, and the claimant obtained a verbal IQ of 77, a performance IQ of 72, and a full scale IQ of 72. Mr. Willis stated that her intelligence was borderline and that she had poor insight but no impairment in judgment. The claimant's IQ scores were also

thought to be reduced by anxiety. Her memory was consistent with her cognitive functioning although she appeared to be immature. Achievement testing revealed average reading and spelling ability, but below average math ability. Mr. Willis diagnosed the claimant with an adjustment disorder, NOS, and that she might be helped with psychotherapy (Ex. 5).

The claimant also underwent a state agency consultative with on [sic] April 5, 2001 with Carol Gibbs, M.D. The claimant told Dr. Gibbs that she was taking a college course had [sic] a community college, but had been taking two others but she had to drop those two. She enjoys reading, listening to the radio, watching television, and spending time with her friends. She also helps around the house by cleaning the kitchen, her bathroom and bedroom, and the living room. The mental status examination revealed that she was anxious and her thought processes were linear but limited and nondescript. Dr. Gibbs diagnosed with [sic] claimant with anxiety disorder and personality disorder, but she was capable of performing in a work setting that required simple one and two step task performance and even moderately complex task instruction but may need to be in a low stress environment (Ex. 6F).

(R. 16-18.)

The ALJ considered all of the above-recited evidence and determined that, although Ms. Caldwell has "severe" impairments (i.e., seizure disorder, adjustment disorder, anxiety disorder, personality disorder, and borderline intellectual functioning), Ms. Caldwell retains the residual functional capacity to perform "light" work that does not involve exposure to dangerous machinery or unprotected heights and requires only one and two step instructions, and that such work exists in the national economy. Accordingly, the ALJ concluded that Ms. Caldwell was not "disabled" for Social Security purposes.

### III. STANDARD OF REVIEW

The Social Security Act, 42 U.S.C. § 405(g) and § 1373(c)(3), limits this Court's review of a final decision of the Commissioner to: (1) whether substantial evidence supports the Commissioner's decision, Richardson v. Perales, 402 U.S. 389, 390, 401 (1971); and (2) whether the Commissioner applied the correct legal standards. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th

Cir. 1990); see also Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam). In Smith v. Heckler, 782 F.2d 1176, 1179 (4th Cir. 1986), the Fourth Circuit defined "substantial evidence" as "being more than a scintilla and do[ing] more than creat[ing] a suspicion of the existence of a fact to be established. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. (quoting Perales, 402 U.S. at 401).

The Fourth Circuit has made clear that it is not for a reviewing court to re-weigh the evidence or to substitute its judgment for that of the Commissioner – so long as that decision is supported by substantial evidence. Hays, 907 F.2d at 1456 (4th Cir. 1990); see also Smith v. Schweiker, 795 F.2d 343, 345 (4th Cir. 1986); Blalock v. Richardson, 483 F.2d 773, 775 (4th Cir. 1972). Ultimately, it is the duty of the Commissioner, not the courts, to make findings of fact and to resolve conflicts in the evidence. Hays, 907 F.2d at 1456; King v. Califano, 599 F.2d 597, 599 (4th Cir. 1979) ("This court does not find facts or try the case de novo when reviewing disability determinations."); Seacrist v. Weinberger, 538 F.2d 1054, 1056-1057 (4th Cir. 1976) ("We note that it is the responsibility of the [Commissioner] and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk on nonpersuasion."). Indeed, so long as the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the reviewing court disagrees with the final outcome. Lester v. Schweiker, 683 F.2d 838, 841 (4th Cir. 1982).

### IV. DISCUSSION OF CLAIM

The question before the ALJ was whether Ms. Caldwell is "disabled" as that term of art is defined for Social Security purposes.[1] The ALJ considered the above-recited and other evidence and

---

[1] Under the Social Security Act, 42 U.S.C. § 301, et seq., the term "disability" is defined as an:
> inability to engage in any substantial gainful activity by reason of any medically

9

concluded in his written opinion that Ms. Caldwell had seizure disorder, adjustment disorder, anxiety disorder, personality disorder, and borderline intellectual functioning, all of which were "severe" impairments within the regulatory meaning; that no impairment or combination of impairments met or medically equaled one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4; that Ms. Caldwell retained the residual functional capacity to perform "light" work that does not involve exposure to dangerous machinery or unprotected heights and requires only one and two step instructions; that Ms. Caldwell was a "younger individual" as of her alleged onset date and had a "high school" education; and that there are jobs in the national economy that Ms. Caldwell is suited to perform. Accordingly, the ALJ concluded that Ms. Caldwell was not under a disability as defined for Social Security purposes.

Ms. Caldwell contends that the ALJ erred (1) in the evaluation of Ms. Caldwell's mental residual functional capacity and (2) in the evaluation of Ms. Caldwell's credibility. Ms. Caldwell does not contest the ALJ's finding that work exists in the national economy for an individual with a mental residual functional capacity for "light work" that does not involve exposure to dangerous machinery or unprotected heights and that requires only one and two step instructions. The undersigned concludes that, bearing in mind the difficult standard Ms. Caldwell must meet to prevail in this action, substantial evidence supports the ALJ's findings regarding Ms. Caldwell's residual functional capacity and her credibility, as well as the ultimate conclusion that Ms. Caldwell was not disabled.

---

    determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months ....

Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995).

**Mental Residual Functional Capacity**

The Social Security Regulations define "residual functional capacity" as "what [a claimant] can still do despite his limitations." 20 C.F.R. § 404.1545(a). The Commissioner is required to "first assess the nature and extent of [the claimant's] mental limitations and restrictions and then determine [the claimant's] residual functional capacity for work activity on a regular and continuing basis." 20 C.F.R. § 404.1545(c). The residual functional capacity assessment is based on all the relevant evidence, including observations by treating or examining physicians. 20 C.F.R. § 404.1545(a).

With respect to Ms. Caldwell's mental residual functional capacity, the ALJ concluded that Ms. Caldwell retained the capacity to perform a wide range of work, as long as the work did not involve exposure to dangerous machinery or unprotected heights and was limited to "simple one and two step tasks." Ms. Caldwell concedes that the limitations recommended by the ALJ reflect her seizure and borderline intelligence. Ms. Caldwell, however, argues that the ALJ failed to include limitations consistent with Ms. Caldwell's other impairments – i.e., severe adjustment disorder, anxiety disorder, and personality disorder. In support of this contention, Ms. Caldwell relies upon the opinions of Richard H. Willis, M.A., Carol M. Gibbs, M.D., and Robert Johnson, Ph.D., which she contends the ALJ failed to adequately address.

First, Ms. Caldwell claims that the ALJ failed to consider Mr. Willis' observation that Ms. Caldwell "is likely to have problems adapting to the social demands of school and society without assistance" and neglected to include a restriction on Ms. Caldwell's social functioning. Mr. Willis' evaluation, however, does not impose additional limitations on Ms. Caldwell. Mr. Willis instead recommended that, because of Ms. Caldwell's difficulty adapting, she should take a lighter course

load in school and work her way up to more courses over time. Furthermore, before stating that Ms. Caldwell may have problems adapting without assistance, Mr. Willis suggested that Ms. Caldwell has the ability to be successful in technical level training. As such, the ALJ's evaluation of the totality of Mr. Willis' report was not flawed.

Second, Ms. Caldwell asserts that the ALJ failed to consider Dr. Gibbs' opinion that Ms. Caldwell needed to be in a low stress work environment. Dr. Gibbs did not make an explicit recommendation to that effect, but rather Dr. Gibbs expressed that Ms. Caldwell "would potentially" need to be in a low stress, more nurturing environment. The ALJ's use of Dr. Gibbs' suggestion that Ms. Caldwell's work setting require simple one and two step tasks, without expressly limiting her to a low stress environment, was not erroneous.

Third, Ms. Caldwell argues that the ALJ erred in not resolving an inconsistency between his own findings and the findings of the State agency consultant, Dr. Johnson, regarding the degree to which Ms. Caldwell is limited in her concentration, persistence, or pace. Despite that contention, the ALJ's findings are completely consistent with Dr. Johnson's ultimate conclusion that Ms. Caldwell has the capacity to perform "simple, routine, repetitive tasks." Ms. Caldwell has failed to show that the ALJ's evaluation was inconsistent with Dr. Johnson's overall findings.

Based on the foregoing, the undersigned concludes that Ms. Caldwell failed to establish that the ALJ's evaluation was flawed for failure to include additional limitations. Furthermore, the undersigned concludes that substantial evidence supports the ALJ's determinations regarding Ms. Caldwell's mental residual functional capacity – that is, that she retained the capacity to perform a wide range of work that does not involve exposure to dangerous machinery or unprotected heights and is limited to one and two step tasks.

## Ms. Caldwell's Credibility

The determination of whether a person is disabled by non-exertional symptoms is a two-step process. "First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged." Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996) (citing 20 C.F.R. § 416.929(b); 42 U.S.C. § 423(d)(5)(A)). If there is such evidence, then the ALJ must evaluate "the intensity and persistence" of the alleged symptoms, and the extent to which those symptoms affect the claimant's ability to work. Id. at 595 (citing 20 C.F.R. § 426.929(c)(1)). The regulations provide that this evaluation must take into account:

> "all the available medical evidence," including the claimant's medical history, medical signs, and laboratory findings; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it.

Id. (citations omitted). Furthermore, any credibility finding by the ALJ "must be grounded in the evidence and articulated in the determination or decision." SSR 96-7p.

The record contains evidence of Ms. Caldwell's seizure disorder, adjustment disorder, anxiety disorder, personality disorder, and borderline intellectual functioning, which could be expected to produce many of the symptoms she claimed. In concluding that Ms. Caldwell suffered from severe impairments, the ALJ implicitly found that Ms. Caldwell could satisfy the first prong of the test articulated in Craig.

The ALJ next evaluated the "intensity and persistence" of Ms. Caldwell's symptoms and the extent to which those symptoms affected her ability to work. Id. As the ALJ observed, the record

showed that Ms. Caldwell performed a variety of daily activities, including performing household chores, preparing small meals, reading, and doing crossword puzzles. The evidence also indicated that Ms. Caldwell attended church twice a week and occasionally socialized with friends.

Evidence in the record also supports the ALJ's conclusion that at times Ms. Caldwell has been responsive to medication. In August 2000 and in January 2002, Ms. Caldwell experienced a reduction in the frequency of her seizures when new medications were prescribed.

Additionally, the ALJ's finding that Ms. Caldwell was not credible in her testimony regarding the two hour recovery time required following seizures was supported by the treating notes from a doctor visit in January 2000 where Ms. Caldwell had a seizure at the doctor's office. The ALJ observed that, following Ms. Caldwell's seizure at the office, she was able to perform the finger to nose coordination test without difficulty despite "a bit of unsteadiness." As the Fourth Circuit has noted, it is the ALJ's responsibility, not the Court's, "to reconcile inconsistencies in the medical evidence." Seacrist, 538 F.2d at 1056-57. Whether the undersigned would have drawn the same conclusion from this evidence is irrelevant, so long as there is substantial evidence that supports the ALJ's conclusion. Lester, 683 F.2d at 841.

In summary, the undersigned concludes that the ALJ's findings regarding Ms. Caldwell's mental residual functional capacity correspond with the observations of treating and examining physicians and therefore, are supported by substantial evidence. Furthermore, the ALJ properly considered and evaluated Ms. Caldwell's subjective complaints, and substantial evidence supports the ALJ's conclusion that Ms. Caldwell's testimony was not entirely credible. The case is close, but substantial evidence does support the ALJ's conclusion that Ms. Caldwell is not disabled for social security purposes.

## V. RECOMMENDATIONS

**FOR THE FOREGOING REASONS**, the undersigned respectfully recommends that Ms. Caldwell's "Motion for Summary Judgment" (Document No. 7) be **DENIED**; that the Commissioner's "Motion for Summary Judgment" (Document No. 9) be **GRANTED**; and that the Commissioner's decision be **AFFIRMED**.

## VI. NOTICE OF APPEAL RIGHTS

The parties are hereby advised that, pursuant to 28 U.S.C. § 636(b)(1)(c), written objections to the proposed findings of fact and conclusions of law and the recommendation contained in this memorandum must be filed within ten (10) days after service of the same. Snyder v. Ridenour, 889 F.2d 1363, 1365 (4th Cir. 1989); United States v. Rice, 741 F.Supp. 101, 102 (W.D. N.C. 1990). Failure to file objections to this Memorandum with the district court constitutes a waiver of the right to de novo review by the district court, Snyder, 889 F.2d at 1365, and may preclude the parties from raising such objections on appeal. Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841, 845-46 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Clerk is directed to send copies of this Memorandum and Recommendation to counsel for the parties and the Honorable Graham C. Mullen.

**Signed: June 14, 2005**

David C. Keesler
United States Magistrate Judge